UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
DE BEERS LV TRADEMARK LIMITED and DE     :
BEERS LV LIMITED,                        :
                                         :
                    Plaintiff,           :    04 CIV. 4099 (DLC)
                                         :
         -v-                             :         OPINION
                                         :
DeBEERS DIAMOND SYNDICATE INC. and       :
MARVIN ROSENBLATT,                       :
                                         :
                    Defendants.          :
                                         :
----------------------------------------X

Appearances:

For plaintiffs:
Barbara A. Solomon
David A. Donahue
Laura Popp-Rosenberg
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

For defendants:
Andrew D. Manitsky
Megan J. Shafritz
Gravel and Shea
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402


DENISE COTE, District Judge:

     This case involves a dispute over the rights to use the name

DE BEERS in connection with gemstones, jewelry, and other luxury

goods in the United States market.  DE BEERS, of course, is one

of the most famous brands in the world and -- in the minds of

American consumers, who were exposed to the "A Diamond Is

Forever" advertising campaign featuring the name DE BEERS -- is

inextricably linked to diamonds.  Oddly, however, the entities

that made DE BEERS so famous are not parties to this litigation. Indeed, for reasons discussed below, very little evidence has been submitted regarding who these entities are and what role they play in the diamond trade.

De Beers LV Limited ("DBLV") and De Beers LV Trademark Limited ("DBLV TM"), the plaintiffs in this matter, are two British companies that claim to have received rights from the De Beers Group ("DBG") -- which apparently is a consortium of companies that includes De Beers Consolidated Mines Limited ("Consolidated") of South Africa and De Beers Centenary AG ("Centenary") of Switzerland -- to exploit the DE BEERS mark in the United States. One of the plaintiffs has registered DE BEERS with the United States Patent and Trademark Office ("PTO") in connection with luxury retail store services. Plaintiffs have opened two such stores in America which, at present, sell diamond jewelry and watches under the DE BEERS name. More such stores are on the way.

These companies have sued Marvin Rosenblatt ("Rosenblatt") and his company DeBeers Diamond Syndicate Inc. ("Syndicate") under the Lanham Act and New York law for infringement both of the registered mark and of what they assert is the famous mark DE BEERS. The defendants have applied to register DeBeers Diamond Syndicate as a trademark in order to sell diamonds under that name over the Internet, where they have paved the way by registering dozens of domain names with the name DeBeers. Following a bench trial conducted on May 30-31, 2006, this

2

Opinion presents the Court's findings of fact and concludes that the defendants' activities will create confusion with plaintiffs' registered mark DE BEERS.  The plaintiffs have not shown, however, that they are entitled to relief under the famous marks doctrine.

Procedural History

Plaintiffs filed this action on June 1, 2004, alleging trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under New York common law; and trademark dilution in violation of New York General Business Law § 360-1.  In their answer, defendants raised the affirmative defenses of failure to join necessary parties, unclean hands, priority of use of the mark, and lack of standing. Defendants moved to join Consolidated, Centenary, and De Beers Trademarks Ltd. ("Trademarks") as counterclaim defendants.  They alleged Shearman Antitrust Act violations and requested a declaratory judgment against plaintiffs and the counterclaim defendants.  Plaintiffs moved to strike defendants' affirmative defenses of unclean hands and lack of standing.  They also moved to dismiss the counterclaims.  In an Opinion of May 18, 2005, the motion to dismiss the declaratory judgment counterclaim was denied; the motion to dismiss the Shearman Antitrust Act counterclaim was granted; the motion for joinder was denied; the motion to strike the affirmative defense of unclean hands was granted; and the motion to strike the affirmative defense of lack

of standing was denied.  De Beers LV Trademark Ltd. v. Debeers
Diamond Syndicate Inc., No. 04 Civ. 4099 (DLC), 2005 WL 1164073
(S.D.N.Y. May 18, 2005).  Plaintiffs filed an amended complaint
on December 30, 2005, adding a claim for violation of Section 32
of the Lanham Act, 15 U.S.C. § 1114, based on DBLV TM's ownership
of a registered mark in DE BEERS for use in "retail store
services featuring luxury consumer products."

Trial Procedure

     The trial was conducted without objection in accordance with
the Court's customary practices for the conduct of non-jury
proceedings.  The parties filed a Joint Pretrial Order and
proposed findings of fact and conclusions of law on March 15.
The parties also served affidavits containing the direct
testimony of most of their witnesses, as well as copies of all
the exhibits and deposition testimony which they intended to
offer as evidence in chief at trial.

     With its Pretrial Order submissions, plaintiffs presented
declarations constituting the direct testimony of Pierre
Mallevays ("Mallevays"), former director of acquisitions for
LVMH-Moët Hennessy Louis Vuitton ("LVMH") and its chief
negotiator during the creation of plaintiffs through a venture
with DBG; Guy Leymarie ("Leymarie"), chief executive officer of
DBLV; Amanda Fogg ("Fogg"), legal counsel and secretary for DBLV
and DBLV TM; Alyce Alston, chief executive officer of DBLV US,
Inc., a wholly owned subsidiary of plaintiff DBLV; Lynn Diamond

("Diamond"), executive director of the Diamond Promotion Service, a unit of J. Walter Thompson U.S.A., Inc. ("JWT"), an advertising firm; Joan Parker ("Parker"), consultant to DBLV; Benedict Bird, a partner in the law firm Linklaters; Stuart Jennison ("Jennison"), a legal assistant at the law firm Jennison & Schultz, P.C.; Merida Lopez ("Lopez"), Mario Ortiz ("Ortiz"), and David Vanegas ("Vanegas"), paralegals at the law firm Fross Zelnick Lehrman & Zissu, P.C.; and Philip Johnson ("Johnson"), chief executive officer of Leo J. Shapiro Associates, Inc., a market research and consulting firm. With the exceptions of Jennison, Ortiz, and Vanegas, who defendants chose not to cross-examine, and Bird, whose testimony was rendered irrelevant by a ruling before trial, each of these witnesses appeared at trial and was cross-examined.

Defendants offered the testimony of defendant Rosenblatt; and Thomas Scheer ("Scheer"), a friend of Rosenblatt and an owner of Jarai & Scheer, a diamond dealer. Both witnesses appeared at trial and were cross-examined. Defendants also subpoenaed Caroline Amand ("Amand"), client director for Landor Associates, a branding firm. Amand testified at trial and was cross-examined.

Excerpts from the deposition testimony of the following individuals were offered and received into evidence at trial. Plaintiffs offered excerpts from the depositions of Caryl Capeci-Cossart ("Capeci-Cossart"), former employee of advertising agencies JWT and N.W. Ayer ("Ayer"); Christine M. Herring, a

budget and accounts executive at the Diamond Trading Company, the sales and marketing arm of DBG; Carl Marcus ("Marcus"), chairman and founder of Capetown Diamond Corp.; and Rosenblatt. Defendants offered excerpts from the depositions of Stephen C. Butcher ("Butcher"), president of website design company VickeryHill.com; Capesci-Cossart; Leymarie; and Fogg.

FINDINGS OF FACT

The following constitutes many of the Court's findings of fact.  Additional fact finding appears during the presentation of the Conclusions of Law.

## Plaintiffs

Plaintiffs DBLV and DBLV TM were formed as limited companies under the laws of the United Kingdom on November 30, 2000.  DBLV is owned in equal parts by an affiliate of DBG[1] and by a subsidiary of luxury goods purveyor LVMH.[2]  DBLV TM is wholly owned by DBLV.

Pursuant to the joint shareholder agreement signed by DBG

---

[1] The DBG affiliate is identified in the transaction documents as "Riverbank Investments Limited."  Malleveys testified that it is owned by "various companies within the De Beers Group of companies."

[2] LVMH is a leading luxury goods company, with approximately 50 brands under its control, including Dom Perignon champagne, Christian Dior perfumes, Tag Heuer and Chaumet watches and jewelry, and Luis Vuitton and Givenchy fashion and leather goods.

and LVMH on January 16, 2001, DBLV was created to engage in the "production and marketing of diamond jewellery and associated products under the De Beers brand name." These "associated products" were to include "goods usually sold by luxury goods retailers." In the shareholder agreement, DBG agreed that neither it nor its affiliated companies would compete with DBLV in the manufacture or sale of diamond jewelry or other luxury goods to consumers.

DBG and LVMH are equal shareholders in DBLV, and each appoints half of its directors. The company is run and managed by officers who are independent of DBG, LVMH, and their affiliates. DBG and LVMH are entitled to share in the revenue stream of DBLV. They have committed to make equal financial contributions to the company, but since DBG also contributed the rights in the DE BEERS mark described below, it is entitled to a greater share of the profits in excess of a set amount until another designated amount of profits is achieved, at which point they again split the profits equally.

The Transfer of Rights in DE BEERS

Plaintiffs trace their claim to the DE BEERS name to DBG members Consolidated and Centenary. On January 12, 2001, Consolidated and Centenary assigned the rights in DE BEERS worldwide (except in Southern Africa) to De Beers Intangibles Limited ("Intangibles"), which is also a part of DBG. On January 15 -- the day before the shareholder agreement was executed --

Intangibles assigned all of its rights to use DE BEERS in the
United States to its wholly owned subsidiary Trademarks.  The
agreement stated that Trademarks would hold the rights "subject
to any license granted to third parties."

The parties intended that Intangibles and DBLV would enter
into a global brand license agreement (the "GBL") that would
provide DBLV with the right to exploit the DE BEERS name in
connection with gemstones and jewelry, among other products,
throughout the world (except in Southern Africa).  A draft of the
GBL was attached to the shareholder agreement.  Because DBG had
already registered its mark in most parts of the world, there was
no need also to assign the rights necessary to apply for
trademark registration in most jurisdictions.  Since, as
explained below, DBG does not operate in the United States, it
had not obtained any trademark registrations in the name DE BEERS
in this country, and it was necessary to assign DBLV TM
intellectual property rights so that that entity could apply for
registration.  DBG did not wish to assign those rights in
connection with either gemstones or jewelry, however, explaining
to its joint venture partner that these rights were just too
close to its core business.  Therefore, to prepare for the
registration applications in the United States, on January 16,
Trademarks signed an agreement assigning to DBLV TM[3] all rights
to use the DE BEERS mark within the United States except in

_____

[3] DBLV TM was then known as Rapids Trade Mark Limited, and
DBLV as Rapids World Limited.

connection with gemstones and jewelry (the "Assignment").[4]

The GBL was not signed until approximately six months later, on July 27, 2001.  According to its terms, Intangibles granted DBLV a license to use DE BEERS worldwide (except in Southern Africa) in connection with jewelry, watches, writing instruments, leather goods, perfumes, cosmetics, glassware, cutlery, clothing, footware, and certain other specified products.  The GBL stated that Intangibles' "primary purpose" in licensing the rights was "to build the DE BEERS brand for diamonds and diamond jewellery." As part of the GBL, Intangibles warranted that "neither it nor any of its Affiliates own rights in the [DE BEERS] Trade Marks or any goodwill attaching thereto ... which are not being licensed under this Agreement."  These documents, which should be read together as part of an integrated transaction among related entities, conveyed to plaintiffs any rights Intangibles possessed to exploit the DE BEERS mark in connection with luxury goods, including gemstones and jewelry.

The creation of this enterprise was widely reported.  A page-one story in the Business Section of <u>New York Times</u> on January 17, 2001, trumpeted,

---

[4] The Assignment explicitly referenced the GBL, noting that Intangibles and DBLV had "agreed to enter into a license agreement ... pursuant to which [DBLV] will be granted certain licenses with respect to the 'DE BEERS' mark for territories outside Southern Africa."  DBLV also recognized Trademarks' "continuing ownership of the Trade Marks for gemstones and jewellery" and agreed not to take any "action [or] any positive steps to obtain or exercise ownership over such rights or the goodwill associated therewith, other than as may be authorized under the Global Brand License."

De Beers, the South African diamond mining powerhouse
that has made its name an international emblem of
elegance and extravagance, and LVMH-Moet Hennessy Louis
Vuitton, the French luxury retailer that has harnessed
the brand power of some of the world's finest goods,
are joining forces....[T]hey were creating a new
company that would open stores in the world's most
fashionable cities to sell diamond jewelry branded with
the De Beers name already so widely associated with the
precious stones."[5]

Two days earlier, the <u>International Herald Tribune</u> had also run a

lengthy article about the partnership of these two giants and

their intention "to set up De Beers stores across the world that

would make the ... company the Dior of the diamond business."

In September 2002, Intangibles transferred to DBLV the

ownership of various Internet domain names, including

debeers.com, debeers.biz, and debeersdiamonds.com.  In 2005,

these sites cumulatively received an average of 8.6 million hits

each month, with approximately 60% coming from within the United

States.


<u>Registration of the DE BEERS Mark</u>

Under the shareholder agreement, DBLV was required to

register DE BEERS as a trademark in the United States "as soon as

---

[5] Although not offered for the truth of any of its
statements, the article sheds some light on why the plaintiffs
have not called any witnesses from DBG to offer testimony at this
trial, an issue of some significance, as discussed below.  The
article reports: "Barred from doing business directly in the
United States because regulators have charged the company with
antitrust violations, De Beers has been trying to find a way out
of the legal stalemate and into the United States.  De Beers will
have no management role in the new company..., an arrangement
that analysts say was done with the primary objective of allowing
the company to do business in its biggest potential market."

practicable" after the agreement was signed.  On January 16, 2001, DBLV TM filed eleven intent-to-use applications with the PTO for "retail store services," as well as for a variety of goods such as flatware, watches, clocks, perfumes, cosmetics, toiletries, luggage, purses, clothing, eyewear, stationery, glasswear, and smokers' articles.  Having only a license but not an assignment of the name DE BEERS for use in connection with gemstones and jewelry, however, DBLV TM did not submit an application to register DE BEERS in connection with gemstones and jewelry.

On June 18, 2001, the PTO determined that "retail store services" was "unacceptable as indefinite" and requested that DBLV TM specify the goods that would be sold.  On December 14, 2001, DBLV TM refined its application to identify "[r]etail store services featuring luxury consumer products."  The PTO again objected that the description was insufficiently specific: "[A]pplicant must specify the type of luxury goods, such as clothing, jewelry, fragrances, stationery, smoking articles, luggage, and china."  On September 16, 2002, counsel for DBLV TM made a written request to the PTO that the agency reconsider its objection on the ground that the products offered in the retail stores "will be of a wide range and will change from time to time."  Counsel for DBLV TM noted that DBLV TM would be competing with luxury retailers such as Cartier, which had been allowed to register its mark for "retail consumer goods and mail order services" without further specifying the goods to be offered.  On

October 12, 2004, the PTO published the mark DE BEERS for "retail store services featuring luxury consumer products."

Meanwhile, the plaintiffs chose a location for their first store in the United States, worked on the construction of the store, and opened it on Fifth Avenue in Manhattan on June 23, 2005. With that opening, DBLV TM filed an allegation of use with the PTO. On September 23, 2005, the trademark registration for luxury retail store services issued.

Fame of the DE BEERS Mark

The DE BEERS name has been used in advertising in the United States from the 1930s to promote the purchase of diamond jewelry generally. Ayer, who designed the ad campaigns for DBG until 1995, began placing ads on television in the 1970s, featuring the DE BEERS name and diamond jewelry. As of 1980 and 1981, when defendant Rosenblatt incorporated Syndicate, advertising prominently displaying the name DE BEERS in connection with diamonds was also appearing in major magazines such as Time, Vogue, and The New Yorker. During the 1980s, advertisements featuring the DE BEERS name and diamond jewelry appeared in about 85 magazines per year. The Ayer advertisements -- which often featured the tagline "A Diamond Is Forever" and, in later years, silhouettes of women and men with diamond jewelry -- are now widely regarded as some of the most successful marketing efforts of the 20th Century.

In 1995, DBG switched its account from Ayer to JWT. JWT

continued to advertise the DE BEERS name and diamond jewelry on television and in magazines and newspapers.  Ayer and then JWT also worked through an in-house unit called the Diamond Promotion Service to help members of the diamond trade, including retailers, develop promotions to sell diamonds.  DBG also engaged in an advertising campaign around the turn of the millennium in 1999 and 2000 (the "Millennium Campaign").  The advertisements pictured diamond jewelry and prominently featured the DE BEERS name and the "A Diamond Is Forever" slogan.  In addition to its paid advertising campaigns, DBG received a substantial amount of unsolicited press coverage.  Between 1996 and 2000, such coverage steadily increased.  In 1996, approximately 237 articles about DE BEERS[6] appeared in United States newspapers and magazines; by 2000, this number had grown to approximately 644.  On occasion, the press referred to DBG and various of the De Beers Group companies as part of a "syndicate."  Sixty such mentions appeared in United States publications between 1973 and 2004.  Eleven of these articles contained the phrase "De Beers diamond syndicate."

This decades-long and expensive advertising campaign achieved strong public awareness for the name DE BEERS and its association with diamonds.  In early 2000, about a year before the execution of the joint venture enterprise documents, DBG hired Leo J. Shapiro & Associates ("Shapiro") to survey

---

[6] Certain publications omitted the space in the De Beers name, referring to the affiliated companies as "DeBeers."  These mentions have been included in the discussion here.

consumers' awareness of the DE BEERS name in this country.
Shapiro carries out a wide-ranging monthly survey of consumer
behavior that also includes inquiries on behalf of a single
corporate client.  Questions about DE BEERS were incorporated
into the April and May 2000 surveys.  The survey uses a
probability sample of the continental United States population.
It is administered by telephone, and interviewers ask to speak
with heads of household over 18 years of age.  Half of the
respondents are male, and half are female.  The survey results
introduced by plaintiffs are based on the answers given by 900
respondents over the two-month period.  Although the survey data
was gathered in 2000, the report submitted by plaintiffs was
compiled by Johnson, Shapiro's CEO, in January 2006.

    The Shapiro survey showed that, unprompted, over 50% of
respondents were familiar with the DE BEERS name, and that over
one-quarter associated DE BEERS with diamonds.  Awareness was
even higher among consumers with household incomes of over
$70,000 annually.  Among those respondents who, through prompting
or not, were familiar with DE BEERS and associated it with
diamonds, about 60% believed that DE BEERS diamonds were of a
higher quality.[7]

    The brand DE BEERS has been identified by <u>Brandweek</u> and
<u>Adweek</u> magazines as one of America's "superbrands."  In the 2001

---

[7] Johnson's report was misleading in its presentation of the
respondents' opinions about the quality of DE BEERS diamonds.  It
did not report that over one-quarter of those who associated the
name DE BEERS with diamonds had no opinion on quality.

survey, DE BEERS diamonds was ranked 144th on the list of America's superbrands, above Campbell's soup and Hallmark greeting cards.

During 2005, the plaintiffs spent close to $4 million on advertising promoting the name DE BEERS.  In November 2005, DBLV arranged for <u>Vogue</u>, <u>W</u>, and <u>Vanity Fair</u>, magazines in which it regularly advertised, to send an e-mail survey to their readers in the New York City area.  Very few readers responded to the survey, but a sizeable majority of those who did respond were aware of DE BEERS as a company.

<u>The Success of the Plaintiffs' Business</u>

Before opening their Manhattan store, the plaintiffs had previously launched stores in London, Paris, and Tokyo.  They now have a second store in the United States, a branch in Beverly Hills, California.  DBLV intends to open as many as 18 additional DE BEERS stores in the United States in the next few years.

The Manhattan store's current product offering consists of diamond jewelry and watches, but DBLV plans to begin selling other luxury goods as well.  None of the DBLV stores purchase their diamonds exclusively from DBG affiliates.  Instead, they purchase their gemstones on the open market, competing with other retailers for higher quality diamonds.  DBLV's stores do not offer loose diamonds for sale, although they sell them when asked.  They do allow customers to select a diamond and match it with a setting of their choice, however, and that happens not

infrequently.

_____In its first week alone, thousands of people visited the New York store each day.  In the half year in which they were open in 2005, the two American stores had total sales of close to $5 million.

Defendants

Defendant Rosenblatt is the president, sole shareholder, and sole employee of defendant Syndicate.[8]  His family has been connected with the diamond trade for three generations, always using some variation of the family name as its business name. Rosenblatt began working for his family's diamond business, located at 580 Fifth Avenue in Manhattan, in the mid-1950s.  As a family business, it bought and sold diamond jewelry and loose diamonds, principally providing consignment merchandise to New York dealers and retailers.  It did not sell to the public. Indeed, the public did not even have access to the floor on which its office was located.

In September 1981, after his father had died and when he was about 40 years of age, Rosenblatt formed DeBeers Diamond Syndicate, a Delaware corporation.[9]  He decided that he wanted to

_____

[8] Although Rosenblatt testified that the name of his company is "Debeers", his corporate records and activities use the name "DeBeers," with a capital B.  Thus, the plaintiffs use De Beers, with a space, and the defendants use the one word DeBeers in Syndicate's corporate name.

[9] Rosenblatt asserts that in the wake of the runaway inflation of the late 1970s, he believed that investors would be

16

reorient the family business toward the consignment of higher quality diamonds, and expected that his choice of the company's name would help to convey that intention.  Rosenblatt asserts that he chose the name DeBeers because of what he describes as its "mythological association with diamonds."  No one in his family, nor anyone associated with Syndicate, has the surname DeBeers or any other connection with the name DE BEERS.  He testified that he added syndicate to the name because of its "cheeky" evocation of "a shadowy cartel that controlled the industry."

Rosenblatt understood that the name DE BEERS had powerful connotations.  He and his fellow members of the New York City diamond trade used the name DE BEERS and the word syndicate to refer interchangeably to the cartel that they believed controlled the world's supply of rough diamonds.  Rosenblatt's family in fact knew at least two "sightholders," that is, individuals who bought rough diamonds from the DE BEERS syndicate during the "sights" that were held in London for a week at a time, roughly ten times a year.

Syndicate was incorporated in Delaware, but had no other business address than the family business office at 580 Fifth

---

drawn to diamonds as a hedge against another inflationary spiral.
The evidence suggests, however, that if Syndicate did business at
all, it did so only in the wholesale market.  There has been no
indication that it actually pursued customers interested in
hedging against inflation.

Avenue in Manhattan.[10]  Rosenblatt added the name of his new
company to his office door, where it appeared along with his
family name.  A family friend who worked in the diamond trade
testified that Rosenblatt's use of the DeBeers name provoked
laughter in the industry because "it was a gutsy thing to do."

Although Rosenblatt asserts that Syndicate bought,
consigned, and sold loose diamonds, he has not offered any
documents confirming even a single commercial transaction under
the corporate name.  He has not shown that the corporation had
business cards, filed tax returns, had a separate telephone
listing, or conducted any business whatsoever.  Indeed, he has
not shown how a customer would have understood that any single
transaction was being conducted through Syndicate as opposed to
the Rosenblatt family business.  What is clear is that Rosenblatt
soon abandoned any interest in the corporation.

In 1986, Rosenblatt's mother died and he moved to Europe.
By 1986, the corporation had become inoperative as a matter of
law for its failure to file annual reports and non-payment of
taxes.  By the early 1990s, Rosenblatt had even given up the
lease on his offices at 580 Fifth Avenue.

Learning that DBG and LVMH intended to launch a line of
jewelry and open luxury retail stores employing the name DE BEERS
in the United States, in late 2001, Rosenblatt decided to

---

[10] A trademark service search for the mark De Beers applied
to diamonds that was conducted for Rosenblatt in 1981 revealed
two New York businesses using the name De Beers: De Beers Diamond
Abrasives and De Beers Diamonds Ltd.

resurrect his corporation, but this time to use it to sell polished, certificated diamonds over the Internet at "very competitive prices."[11]  He believed that the use of the name DeBeers would allow his company to succeed where other internet diamond businesses had failed because the name "always had a special cachet as well as wide public recognition and acceptance."

As a first step, on January 15, 2002, Rosenblatt reactivated Syndicate as a Delaware corporation.  The business address of the company is now the same as Rosenblatt's home address in Manhattan.  It has no separate telephone number and has done no advertising.  Syndicate has not contacted potential customers or dealers to advise them that it is going into business again.  It is essentially dormant, awaiting the outcome of this litigation.

Rosenblatt has proceeded cautiously, well aware that he has no legitimate claim to the use of the name DeBeers.  He decided that he would test the waters by filing for a trademark.  In preparation for the filing of a trademark application, Rosenblatt's attorneys performed a Thomson & Thomson trademark search on January 17.  The search found no active or pending registration of DE BEERS for diamonds, diamond jewelry, or the

---

[11] Although Rosenblatt asserts that he chose this moment, over fifteen years after abandoning this corporate vehicle, to revive the name DeBeers because he believed that the Internet presented a business opportunity to sell loose diamonds at discounted prices, that assertion must be rejected to the extent that he is using it to explain the timing of his reentry into the diamond business and the revival of his corporation.

purchase and sale of diamonds and diamond jewelry.  The first
eleven references in the search, however, reflected filings in
January 2001 by DBLV TM[12] to use the mark DE BEERS in connection
with a variety of items, including retail store services, watches
and clocks, flatware, and porcelain.  The search also revealed
several marks for fine jewelry or diamonds that had been
abandoned in the face of opposition by the Jewelers Vigilance
Committee, Inc., including attempts to register
Debeersonline.com, Debeersonsale.com, Debeersusa.com, and Forever
Yours Debeers Dia. Ltd.  The lengthy search report also noted
that DeBeers Consolidated Mines had run a print advertising
campaign under the slogan "A Diamond Is Forever.  DeBeers."

        Undeterred by results of the search, on January 29, 2002,
Syndicate filed two trademark applications with the PTO for the
mark "DEBEERS DIAMOND SYNDICATE" for "diamonds," and for
"purchasing diamonds for others, wholesale ordering services and
distributorship of diamonds."  The applications identified a
first use date of June 1981, and a first use in commerce date of
January 2002.

        This latter reference was to a single sale arranged by
Rosenblatt to create the appearance of a use in commerce.  On
January 20, 2002, Rosenblatt made a sale of a 1.51-carat diamond
from his personal stock of gems to East Continental Gems, Inc.

---

[12] Although the search identified the applicant as Rapids
Trade Mark Limited, Rosenblatt admits that he understood it was
filed by an entity related to DBG.

for $9,750.  East Continental Gems is located at 580 Fifth Avenue.  This is the only sale of a diamond that Syndicate contends that it has made since its reactivation.

In addition to submitting misleading evidence about the use of the mark in commerce, Rosenblatt made other misrepresentations to the PTO about the nature of his business enterprise, specifically, the extent to which the mark had been used in connection with any sale of goods or the provision of services. For example, despite Syndicate's representation to the PTO that the mark "is used on or in connection with the above-identified services, by applying the mark to advertising and promotional materials for the services, and in other ways customary to the trade," Syndicate did not have any advertising or promotional materials.  Rosenblatt, as president of Syndicate, also represented to the PTO that he believed that he was the "owner" of the mark, and that to the best of his knowledge,

> no other person, firm, corporation or association has
> the right to use the above-identified mark in commerce,
> either in the identical form thereof or in such near
> resemblance thereto as to be likely, when used on or in
> connection with the goods or services of such other
> person, to cause confusion, or to cause mistake, or to
> deceive.

Contrary to this representation, Rosenblatt understood that his use of the mark would likely cause confusion.

The PTO required Syndicate to disclaim the words diamond and syndicate.  After Syndicate agreed to do so, and after an examining PTO attorney found that his search of PTO records had uncovered "no similar registered or pending mark which would bar

registration," the PTO published Syndicate's applications to register the mark in the Official Gazette for opposition on September 17 and October 1, 2002. Plaintiffs filed a timely opposition and eventually commenced this action in June 2004. As a result, proceedings in the PTO over the Syndicate applications are stayed.

Meanwhile, in April 2002, Rosenblatt contacted Vickery Hill, a website development firm, which created a proposal for an Internet site to allow Syndicate to both "advertise" its business and "sell diamonds online". Vickery Hill added to its proposal the representation that Syndicate "currently owns the domain name: debeersdiamondsyndicate.com and will be responsible for any trademark or copyright issues associated with it," because it was concerned about liability that might attach to Rosenblatt's use of the name DeBeers. Vickery Hill had never added such language to any other client proposal.

At approximately the same time, Rosenblatt's son prepared a preliminary design for a Syndicate website. The most prominent word on the site's opening page is the word "De Beers," that is, the identical name and spacing used in plaintiffs' mark. The first page is entitled "De Beers Luxury Diamond Search," and introduces a stylized logo "Simple Luxury De Beers," with an interlocking d and b for the name De Beers. Syndicate's corporate name does not appear on the proposal for the site. Rosenblatt testified that he will include a disclaimer on the site that will "disclaim any association with any foreign 'De

Beers' entity that might or might not exist."

In May 2002, Rosenblatt began looking for investors in what he described as a project to "exploit[] the brand 'DeBeers' in the United States by means of e-commerce." He put together a document describing the enterprise, which he sent to at least one potential investor. The document notes that DeBeers was originally associated with a South African mining company beginning in the late 19th century. Although, according to the document, Syndicate had "no connection with the South African company," Rosenblatt hoped to use the "brand recognition" and "cachet" of the DeBeers name to build Syndicate's business.

In late 2002, Rosenblatt applied for and obtained approximately 35 Internet domain names involving variations on the name DeBeers.[13] Many of these registrations do not use the word syndicate, but are for names such as debeersdiamonds.biz, debeersdiamondswholesale.biz, debeersdiamondsdirect.com, and debeersdiamondsretail.net. Rosenblatt plans to launch the Syndicate website and begin making sales once the registrations have issued.

Actual Confusion

Although the defendants have not begun to operate a website, their application to register a trademark with the DeBeers name has already generated confusion. Capetown Diamond Corporation, a

---

[13] On November 19, 2003, Syndicate extended the registrations for one year.

retail jeweler, placed an ad in the <u>New York Times</u> in July 2005 for a diamond ring and used the phrase "En Garde DeBeers" to communicate that his jewelry was less expensive than what could be purchased in plaintiffs' United States stores. He added a footnote to the advertisement, stating that DeBeers is "a registered trademark of DeBeers Diamond Syndicate Inc.," wrongly believing that the plaintiffs were responsible for the defendants' trademark application. Syndicate has also been named as a defendant in one lawsuit and contacted by plaintiffs' counsel in another litigation based on the mistaken belief that it was associated with DBG.

CONCLUSIONS OF LAW

DBLV TM brings a claim for trademark infringement of its registered mark under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and both plaintiffs bring a claim for infringement of their unregistered and common law mark under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). They also bring a claim of unfair competition under New York common law, and a claim of dilution under New York Gen. Bus. L. § 360-1.

I. Lanham Act Claims

To sustain a claim for trademark infringement under Sections 32 or 43(a), a plaintiff must first show that its mark is entitled to protection, and then that the defendant's use of the mark is likely to cause confusion. <u>Time, Inc. v. Petersen</u>

Publ'g. Co. LLC, 173 F.3d 113, 117 (2d Cir. 1999). Here, DBLV
TM's Section 32 claim is based on its registration of DE BEERS in
connection with luxury retail stores, which, plaintiff argues,
gives it a protectable mark as of the filing of its application
in January 2001. Plaintiffs' Section 43(a) claim is based on the
argument that, pursuant to the famous marks doctrine, DBG
obtained protectable rights in the DE BEERS mark, which it later
transferred to plaintiffs.[14] Regardless of how plaintiffs'
rights are construed, they argue, defendants' use of DE BEERS in
connection with the sale of loose polished diamonds is likely to
cause customers to be confused about the relationship between
plaintiffs' and defendants' products.

A. Plaintiffs' Rights in DE BEERS

---

[14] Plaintiffs also claim that "DBG owned protectable rights
in the United States by virtue of the 'analogous use' doctrine."
It is not clear whether they intend to employ this theory to meet
their burden of showing a use of the mark in commerce under the
famous marks doctrine, or whether they proffer it as an
alternate, free-standing source of rights under Section 43(a).
In either case, their argument is rejected. For the reasons
discussed below, plaintiffs will not be permitted to avail
themselves of the famous marks doctrine without direct,
substantial proof of use in commerce. Additionally, insofar as
plaintiffs contend that they can obtain protectable rights in a
mark solely through advertisements and press coverage, this view
of Section 43(a)'s scope has never been adopted by this circuit.
Indeed, the one case to which plaintiffs point to support their
position, Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.,
No. 01 Civ. 2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005),
involved a company that had used the disputed mark on the
packaging in which it shipped products to American customers. Id.
at *7. There was no question that the name had been used in
commerce, and therefore the court's discussion of "trade name"
recognition is not relevant here.

1. Section 32

    Section 32 provides, in relevant part:

    Any person who shall, without the consent of the
    registrant--

    (a) use in commerce any reproduction, counterfeit,
    copy, or colorable imitation of a registered mark in
    connection with the sale, offering for sale,
    distribution, or advertising of any goods or services
    on or in connection with which such use is likely to
    cause confusion, or to cause mistake, or to deceive; or

    (b) reproduce, counterfeit, copy, or colorably imitate
    a registered mark and apply such reproduction,
    counterfeit, copy, or colorable imitation to labels,
    signs, prints, packages, wrappers, receptacles or
    advertisements intended to be used in commerce upon or
    in connection with the sale, offering for sale,
    distribution, or advertising of goods or services on or
    in connection with which such use is likely to cause
    confusion, or to cause mistake, or to deceive,

    shall be liable in a civil action by the registrant for
    the remedies hereinafter provided.

15 U.S.C. § 1114(1).

    As noted above, plaintiff DBLV TM owns a federal
registration for DE BEERS in connection with "retail store
services featuring luxury consumer products."  Registration of a
trademark allows the owner to sue an infringer under Section 32
and creates a presumption that the mark is valid.  See 15 U.S.C.
§ 1057; see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529
U.S. 205, 209 (2000).  Once a registration has issued, a
registrant will be deemed to have priority as of the filing of
the registration -- here, January 16, 2001 (the "priority date").
15 U.S.C. § 1057(c).  In other words, the rights of the mark's
owner will trump those of anyone who, prior to filing, had not

(1) used the mark, (2) filed an application with the PTO to register the mark, which is pending or has resulted in registration, or (3) filed a foreign application to register the mark and filed an application under Section 44(d) to register the mark in the United States, which is pending or has resulted in registration.  Id.  Even if a party shows that it obtained such rights before the claimed priority date, it may still be liable to the registrant if it is found to have abandoned the rights through lack of use.  See 15 U.S.C. § 1127.

Defendants do not claim to have filed an application with the PTO or any foreign trademark agency prior to January 16, 2001.  Moreover, as discussed more fully below, even if they had been able to show that they used DeBeers in commerce before the priority date, it is clear that they abandoned the rights.  Their only remaining argument against recognition of plaintiffs' priority date of January 16, 2001, is that plaintiffs perpetrated fraud on the PTO in the process of applying for the registration. In particular, defendants allege that plaintiffs made a false statement and failed to disclose to the PTO that their product offering would sell diamond gemstones and jewelry, and that they lacked the rights necessary to trademark DE BEERS in connection with that category of products.

Fraud in procuring a trademark occurs when "an applicant knowingly makes false, material representations of fact in connection with an application."  L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1351 (Fed. Cir. 1999)(citation omitted).  A

party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by "clear and convincing evidence." Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988). The Trademark Trial and Appeal Board of the PTO has held that this is a "heavy burden" that requires the opposing party to present proof that leaves "nothing to speculation, conjecture, or surmise. Should there be any doubt, it must be resolved against the party making the claim." Marshall Field and Co. v. Mrs. Fields Cookies, 25 U.S.P.Q.2d 1321, 1328 (T.T.A.B. 1992). "Merely making a false statement is not sufficient to cancel a mark." L.D. Kichler, 192 F.3d at 1351.

Here, defendants have fallen short of meeting this heavy burden. Defendants first contend that DBLV TM falsely represented its intended product offering to the PTO by stating that "the products will be of a wide range and will change from time to time." Defendants note that the plaintiffs' core product is and always will be diamond jewelry. Therefore, they argue, the above statement was false to the extent it suggested that DBLV TM could not identify any products that would always be offered at plaintiffs' stores. This argument is frivolous. As a simple linguistic matter, the claim is not that every product will change, but that the product offering as a whole will change. Defendants have not contested plaintiffs' suggestion that they already do offer at least one product other than diamond jewelry, nor their stated intention to increase their

non-jewelry offerings.  The statement, therefore, is not false.

Defendants also rely on the alleged omissions described above.  In other contexts, the Second Circuit has repeatedly held that fraud can be committed by omission, not just misrepresentation.  See, e.g., Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006) (common law fraud); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173-74 (2d Cir. 2005) (securities fraud).  In the absence of a fiduciary duty (which defendants do not allege here[15]), an omission is typically found to confer liability only where it is necessary to clarify an ambiguous or partial statement, or it causes another party to act on the basis of mistaken knowledge.  See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland National Bank, 57 F.3d 146, 155 (2d Cir. 1995).  That is not the case here.

Defendants claim that plaintiffs failed to state explicitly that their core product would be diamond jewelry and suggest that DBLV TM should have described its mark as covering "retail store

---

[15] Defendants do argue that plaintiffs owed a duty of "uncompromising candor" to the PTO.  They point to no Second Circuit authority, however, identifying such a duty in the trademark context.  Under 37 C.F.R. § 1.56(a), a patent applicant has a "duty of candor and good faith in dealing with the [PTO]," but defendants have not shown that a trademark applicant is subject to the same requirement.  In any event, even in the patent context, the regulations explicitly state that the duty does not require an applicant to "submit information which is not material to the patentability of any existing claim."  Id.  As discussed below, defendants have not shown that the information allegedly omitted by DBLV TM was material to the PTO's decision.  Therefore, even if a duty of uncompromising candor were applicable here, plaintiffs' conduct did not violate it.

services featuring diamond jewelry and other luxury products."
The PTO's own Trademark Manual of Examining Procedure, however,
deems the use of the terms "including," "comprising," "such as,"
"and the like," "and similar goods," and "like services" too
indefinite to use in a trademark application.[16]  As a result,
they "are almost always unacceptable."  United States Patent and
Trademark Office, Trademark Manual of Examination Procedures §
1402.03 (4th ed. April 2005).  Defendants' argument, therefore,
amounts to a suggestion that DBLV TM committed fraud by failing
to submit an application that would almost certainly have
violated the PTO's guidelines.  This contention is rejected.

    Finally, defendants claim that DBLV TM failed to disclose to
the PTO that it <u>could not</u> register DE BEERS in connection with
gemstones and jewelry because, to the extent it possessed any
such rights in the mark, it did so pursuant to a license, rather

---

[16] Defendants appear to have misinterpreted the PTO's
request that DBLV TM phrase its application as follows: "Retail
store services featuring _____ (the applicant must specify the
common commercial name of the goods sold, such as jewelry,
clothing)."  The PTO could not have been requesting that DBLV TM
list examples of the types of products it would sell, as that
would have contradicted its rules.  Indeed, in the paragraph that
follows the above sentence, the PTO reminded DBLV TM that "while
an application may be amended to clarify or limit the
identification, additions to the identification are not
permitted."  In other words, if DBLV had specified what it would
offer at its stores, it would have had a registered trademark
only for those goods and no others.  <u>See</u> 37 C.F.R. § 2.71(a)
("The applicant may amend the application to clarify or limit,
<u>but not to broaden</u>, the identification of goods and/or
services.")(emphasis supplied).  Subsequent to DBLV TM's
application, the PTO issued a notice of allowance for the marks
HARRODS and HARRODS KNIGHTSBRIDGE for "retail store services
featuring luxury consumer products."

than an assignment.  This argument fails for a number of reasons.
First, the PTO did not request such information.  Second, the
omission of this material did not make any of the plaintiff's
other statements ambiguous or misleading, much less false.  The
shareholders' agreement that governs the scope and conduct of
plaintiffs' business provides that their product line "will be
consistent with the types of products sold by luxury goods
retailers."  Plaintiffs' representations to the PTO regarding
their product offerings is entirely consistent with the
agreement: They told the PTO that the product line would change
from time to time, and they likened their application to one
filed by Cartier, a well-known luxury goods retailer whose
primary product offering is jewelry.

Third, plaintiffs have not shown that the omission
materially affected the PTO's actions.  It is clear from the
shareholders' agreement and the GBL that, regardless of whether
Intangibles or Trademarks currently owns the rights to use DE
BEERS in connection with gemstones and jewelry, the owner intends
for plaintiffs to be able to exploit these rights in the United
States.  Plaintiffs were not trying to fool the PTO into allowing
them to profit from a mark that the rightful owner was hoping to
exploit.  Rather, they were attempting to carry out the owner's
wishes.  Therefore, it seems unlikely that the PTO would have
looked less favorably on plaintiff's application had it known

that it was unable to register a mark for diamond jewelry.[17]

In sum, defendants have not shown that DBLV TM perpetrated a
fraud on the PTO when it filed for registration of the DE BEERS
mark in connection with luxury retail store services.  Plaintiffs
are entitled to rely on a priority date of January 16, 2001 in
connection with the Section 32 claim.

2. Section 43(a)

Section 43(a) provides in relevant part:

Any person who, on or in connection with any goods or
services, or any container for goods, uses in commerce
any word, term, name, symbol, or device, or any
combination thereof, or any false designation of
origin, false or misleading description of fact, or
false or misleading representation of fact, which --

(A) is likely to cause confusion, or to cause mistake,
or to deceive as to the affiliation, connection, or
association of such person with another person, or as
to the origin, sponsorship, or approval of his or her
goods, services, or commercial activities by another
person . . .

shall be liable in a civil action by any person who
believes that he or she is or is likely to be damaged
by such act.

15 U.S.C. § 1125(a).  To establish that a mark is covered by
Section 43(a), a plaintiff must demonstrate that it is
protectable, and that plaintiff has engaged in "prior use and
ownership."  <u>Virgin Enters., Ltd. v. Nawab</u>, 335 F.3d 141, 146 (2d
Cir. 2003).

---

[17]  This is particularly true, given that DBLV TM was
registering a <u>services</u> mark in class 35, and not a mark for use
in connection with a product, which, if it had been for gemstones
and jewelry, would have been in class 14.

Although the language of Section 43(a) imposes a requirement of "use[] in commerce" only on the party who is alleged to have infringed an unregistered mark, courts impose the same requirement on plaintiffs who claim such infringement. De Beers, 2005 WL 1164073, at *7. Here, plaintiffs have offered no competent evidence that either they or DBG used DE BEERS as a mark in the United States prior to 2005.[18] They seek to circumvent the requirement, however, by invoking the "famous mark" doctrine. Under this doctrine, plaintiffs argue, DBG acquired trademark rights in the DE BEERS name by conducting business abroad under the mark.

The famous marks doctrine is a "controversial common-law exception" to the principle that the use of a mark overseas cannot form the basis for a holding of priority trademark use. Id. Under the doctrine, a foreign mark is protectable despite its lack of use in the United States "where the mark is so well known or famous as to give rise to a risk of consumer confusion if the mark is used subsequently by someone else in the domestic marketplace." Id. (quoting ITC Ltd. v. Punchgini, Inc., No. 03 Civ. 1306 (GEL), 2005 WL 351121, at *10 (S.D.N.Y. Feb. 10, 2005)). The Second Circuit has expressly declined to reach the

---

[18] Plaintiffs claim that DBG allowed De Beers-branded diamonds to be sold in the United States in 1999 and 2000 as part of their Millennium Campaign. They have not, however, provided sufficient admissible evidence to allow reliable fact-finding of what was sold, much less when, where, by whom, and to whom it was sold. As a result, the evidence is inadequate to show that the promotion constituted a use of the mark in commerce in the United States.

33

issue of whether to recognize the famous marks doctrine.  See
Empresa Cubana Del Tobaco v. Culbro Corp., 399 F.3d 462, 475 (2d
Cir. 2005).  As the Court has previously discussed in more
detail, see De Beers, 2005 WL 1164073, at *8-9, significant
prudential considerations augur in favor of recognizing the
doctrine.  As a result, it would be applied here "if
appropriate."[19]  Id.

Defendants offer two reasons for the Court to find that the
famous marks doctrine is inappropriate here.  First, defendants
urge that the plaintiffs should not be allowed to "take advantage
of" the doctrine, contending that the Second Circuit's Empresa
decision stands for the proposition that an entity that does not
do business in the United States "for legal reasons" cannot avail
itself of the famous marks doctrine.  The holding, however, is
not so broad.  In Empresa, the Circuit declined to allow a Cuban
company to obtain trademark rights via the famous marks doctrine
because such a result would have amounted to a "transfer of
property rights ... in violation of the [federal] embargo."
Empresa, 399 F.3d at 476.  Here, defendants do not allege that
DBG was subject to such an absolute bar to conducting business in
the United States.  Instead, they argue that DBG avoided United
States jurisdiction because it feared it would face a variety of

_____

[19] As defendants point out, another court in this district
recently disagreed with this Court's recognition of the famous
marks doctrine.  See Almacenes Exito S.A. v. El Gallo Meat
Market, Inc., 381 F. Supp. 2d 324, 327 (S.D.N.Y. 2005).  Because
the Second Circuit has not yet resolved this divergence, the
Court's previous ruling on the issue remains the law of the case.

legal actions if it did business in the country.  Defendants do
not, however, point to any cases indicating that an entity's
<u>motivation</u> for not using a mark in the United States is relevant
to the applicability of the famous marks doctrine.  Therefore,
DBG's choice to avoid doing business in the United States --
whatever its reasons for making it -- does not preclude it from
obtaining American rights to a mark it used overseas.[20]

Defendants' second argument, however, poses a more serious
challenge to DBG's claimed rights.  They claim that, regardless
of the fame of DE BEERS, DBG never used it <u>as a mark</u>.
The Act defines a "trademark" to include "any word, name, symbol,
or device, or any combination thereof used by a person ... to
identify and distinguish his or her goods ... from those
manufactured or sold by others and to indicate the source of the
goods."  15 U.S.C. § 1127.  A mark is considered to be used in
connection with goods when "it is placed in any manner on the
goods or their containers or the displays associated therewith or
on the tags or labels affixed thereto ..." <u>Id.</u>  It is deemed to
be used in connection with services "when it is used or displayed
in the sale or advertising of services and the services are
rendered in commerce ..."  <u>Id.</u>  Fundamentally, then, rights in a
mark do not arise through "mere adoption," but only out of actual
use.  <u>Buti v. Perosa, S.R.L.</u>, 139 F.3d 98, 103 (2d Cir. 1998)

---

[20] It is for this reason that, through a ruling on a motion
<u>in limine</u> made by plaintiffs before trial, evidence proffered by
defendants of the legal problems and controversial business
practices of DBG was excluded from the trial.

(quoting United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918)).

Here, plaintiffs have put themselves in the awkward position of trying to prove that DBG used the DE BEERS mark in foreign commerce without actually submitting any testimony from De Beers Group employees.  Indeed, they have consistently fought to keep virtually all evidence of DBG's activities from coming into evidence at trial.  Whatever other advantages plaintiffs may have seen in this strategic choice at the time, it now makes it exceedingly difficult for them to rely on a doctrine that turns entirely on the activities of DBG.

The evidence plaintiffs have submitted regarding DBG's business is scattered and piecemeal.  It has been possible, however, to piece together a picture of the DBG enterprise, based largely on press clippings presented by plaintiffs as evidence of the fame of the mark.[21]  It appears that for much of the 20th century, DBG dominated the global diamond trade, controlling mines that produced as much as 85 percent of the world's "rough" uncut diamonds.  They sold these stones to a small group of dealers, cutters, and polishers, through the Central Selling Organization ("CSO") in London.[22]  These sales, or "sights,"

---

[21] Because most of these articles are hearsay, they were not admissible for the truth of the facts contained therein.  As a result, this discussion is provided as context, but is not part of the findings of fact.

[22] The CSO is either related to, or also known as, the Diamond Trading Company.  These companies, like some of the others within DBG, do not use De Beers in their names.

allowed DBG to exert enormous influence over the global price of diamonds by controlling the quality and quantity of gems released for sale each year.

DBG companies have apparently registered DE BEERS for use in connection with gemstones and jewelry in dozens of countries. They have not done so in the United States. DBG has been the subject of multiple lawsuits in the United States, including at least one antitrust action brought by the Government. As a result, DBG has avoided doing business directly in the American market, and its executives avoid travel to the United States. As already noted, some press reports speculate that the structure of DBLV -- in particular, its independence from DBG -- was driven by DBG's desire to circumvent the legal obstacles to its operating in the United States.

DBG's control over the diamond market has apparently fallen in recent years. This decline has been linked to the discovery of new mines, political turmoil in various African countries, and the enormous expense of DBG's efforts to keep prices high by "soaking up" excess diamonds on the world market. In part because of its loss of control over the diamond market, DBG began looking for new avenues of business, eventually deciding to enter and leverage the power of the DE BEERS name in the retail market. This led to the formation of the companies that are plaintiffs in

Nonetheless, the trial testimony of both plaintiffs' and defendants' witnesses indicates that each of the companies in the consortium, as well as the consortium itself, are commonly referred to in the industry as "De Beers" or the "syndicate."

this action.

Plaintiffs have consistently opposed the defendants' efforts to submit evidence of DBG's turbulent past, as well as its alleged bad acts, including its purported anticompetitive practices and its claimed connection to the so-called "conflict diamond" trade. For instance, prior to trial, the Court granted plaintiffs' motion _in limine_ preventing defendants from introducing a DBG annual report. Similarly, during discovery, plaintiffs succeeded in quashing defendants' efforts to depose Gary Ralfe, a director of DBLV and chairman of the board of DBLV TM, about his activities as a managing director of DBG. Further, plaintiffs seem to have acceded to the apparent desire of DBG executives to avoid depositions and American discovery.

As a result, the evidence that DBG used DE BEERS as a mark is fragmented. Diamond testified that she attended trade shows where DBG operated booths marked with the DE BEERS name, and visited the company's offices and mines in England and Africa, which also displayed the DE BEERS name; Parker observed DBG's sale of rough diamonds in London at sights, although she was not sure whether they were made under the DE BEERS name; Leymarie testified that while he worked at Cartier, DBG approached him about supplying the company with diamonds; Scheer admitted that on his company website, he describes the firm as being "sight-holders of De Beers' for finished products"; and Rosenblatt himself admitted in his presentation to a potential investor that "DeBeers [was] synonymous with both diamonds and a monolithic

38

international cartel that controlled the worldwide distribution
of 'rough' (uncut) diamonds."  Plaintiffs also introduced a 1981
article from Business Week that states that De Beers controlled
85% of the world's uncut diamonds.

Although such evidence is both admissible and probative of
DBG's use of DE BEERS as a mark, it is insufficient to establish
such use for the purposes of the famous marks doctrine in this
case.  As noted above, the doctrine is controversial and has not
yet been recognized by the Second Circuit.  Furthermore, because
the doctrine is an abrogation of the territoriality principle, a
fundamental element of trademark law, courts must be extremely
cautious when applying the it.  See, e.g., Grupo Gigante SA De CV
v. Dallo & Co., Inc., 391 F.3d 1088, 1097 (9th Cir. 2004)
(expressing concern about the potential of the famous marks
doctrine to eliminate the territoriality principle altogether by
encouraging courts to treat "foreign uses of the mark just as we
treat domestic uses").

Here, there are undoubtedly dozens of officers and
executives of DBG who could have testified about the companies'
activities based on first-hand knowledge.  Plaintiffs, however,
decided not to call any of them as witnesses, and chose actively
to oppose defendants' efforts to bring other competent evidence
about DBG into the case.  An added wrinkle here is that, to the
extent plaintiffs have shown that DBG used the DE BEERS mark, the
evidence was largely associated with the sale of raw, unpolished
diamonds.  In the United States, however, the mark's fame among

consumers derives principally from its association with diamond
jewelry -- a product that DBG has apparently never sold.  Under
these circumstances, and given the potential of this
controversial doctrine to alter substantially the landscape of
trademark law, defendants have not proffered enough evidence to
find that any rights in DE BEERS accrued to DBG under the famous
marks doctrine.

B. Defendants' Rights in DE BEERS

        Defendants do not own a registered mark in DE BEERS.
Therefore, their rights in the mark, if any, must derive from
"prior use and ownership."  Virgin Enters., 335 F.3d at 146.  "To
prove bona fide usage, the proponent of the trademark must
demonstrate that his use of the mark has been deliberate and
continuous, not sporadic, casual or transitory."  La Societe
Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265,
1271-72 (2d Cir. 1974).  In other words the proponent must show
"a trade in the goods sold under the mark or at least an active
and public attempt to establish such a trade.  Absent these
elements, no trademark can be created or exist."  Id. at 1274.
The user who first appropriates the mark may prevent others from
using it, "as long as the initial appropriation and use are
accompanied by an intention to continue exploiting the mark
commercially."  Id.  "Determining what constitutes sufficient use
for trademark ownership purposes is obviously a case-by-case
task. ... [T]he balance of the equities plays an important role

in deciding whether defendant's use is sufficient to warrant trademark protection."  Id. at 1274 n.11.

1. The Early 1980s

Defendants claim that during the early 1980s, Syndicate bought and sold Gemological Institute of America ("GIA") stones under the name "DeBeers Diamond Syndicate."  Other than showing that Rosenblatt put the company name on the door of his family business, an action which apparently caused some amusement among occupants of the building, the defendants have not shown through credible evidence that Syndicate engaged in commercial activity during this period.  For instance, defendants have not produced any documents that evidence a single purchase or sale under the Syndicate name.

Moreover, even if Syndicate had established rights in DE BEERS during this period, it abandoned them through disuse of the name between 1986 and 2002.  Abandonment occurs when a mark "has been discontinued with intent not to resume such use."  15 U.S.C. § 1127.  Because intent is difficult to prove directly, it "may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."  Id.[23]  "A proprietor who temporarily suspends use of a mark can rebut the

_____

[23] Prior to the amendment of the Lanham Act, which took effect in January 1996, the statute specified two years as the length of time that could establish a presumption of abandonment. Since defendants did not use the mark for at least 15 years, this change has no impact on the result here.

presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." Silverman v. CBS Inc., 870 F.2d 40, 47 (2d Cir. 1989). A bare assertion of possible future use is not enough. Id.

It is uncontested that defendants did not use the Syndicate name for more than 15 years -- indeed, they admit that the corporate entity was inactive between 1986 and 2002. This period far exceeds the length of time specified by the Act as prima facie evidence of abandonment. Defendants cannot rebut that presumption. They claim that "poor economic conditions" in the mid-1980s prevented Rosenblatt from continuing the business, and that he "always intended to continue the business when conditions were right." Apart from this bare assertion, however, defendants have offered no support for their claim of an ongoing plan to resume use. Conversely, there is ample evidence indicating that Rosenblatt simply abandoned not just the corporate vehicle but the family diamond business altogether. He moved to Europe, opened a gallery, and, though he maintained a residence in New York, he gave up the lease on the offices at 580 Fifth Avenue.

2. Recent Use

Rosenblatt revived Syndicate on January 15, 2002. Five days later, he sold a single diamond to East Continental Gems, Inc. for $9,750. Defendants have not presented any evidence of other purchases or sales by Syndicate since the revival.

Courts typically do not deem usage sufficient "when it is obviously contrived solely for trademark maintenance purposes." La Societe, 495 F.2d at 1273.  This is clearly the case here. The sale was not a bona fide use of the mark in commerce.  In any event, defendants' recent use of the mark comes too late to defend against plaintiffs' Section 32 claim.  Plaintiffs have established a first use date of January 16, 2001.  Therefore, plaintiffs have shown priority over defendants with respect to their use of the mark in connection with luxury retail stores.

C. Likelihood of Confusion

_____In order to succeed on the Section 32 claim, plaintiffs must show that defendants' use of "DeBeers Diamond Syndicate" is "likely to cause confusion in the marketplace."  Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005); accord 15 U.S.C. § 1115(1).  Plaintiffs claim infringement of their registered mark for luxury retail stores, despite the fact that it does not explicitly cover jewelry.  The various protections that are created by a registered trademark are generally limited to the use of the mark "in connection with the goods or services specified in the certificate...."  15 U.S.C. § 1057(b).  Nonetheless, a trademark owner has "rights against use on related, non-competing products ... in accord with the realities of mass media salesmanship and the purchasing behavior of consumers."  Scarves by Vera, Inc. v. Todo Imps. Ltd. (Inc.), 544 F.2d 1167, 1172 (2d Cir. 1976).  The extension of

43

trademark protection to related products guards against improper
restraints on the "possible expansion of the senior user's
market, including consumer confusion, tarnishment of the senior
user's reputation, and unjust enrichment of the infringer."
Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d
Cir. 1987).  The market for luxury goods is sufficiently related
to the market for gem-grade polished diamonds to justify an
inquiry into whether defendants' products are likely to cause
confusion with plaintiff's retail stores.  See Scarves by Vera,
544 F.2d at 1174.

     To establish that defendants' sale of diamonds under the
Syndicate name is likely to cause confusion with plaintiffs'
products and services, plaintiffs must show that "numerous
ordinary prudent purchasers are likely to be misled or confused
as to the source of the product in question because of the
entrance in the marketplace of defendant's mark."  Playtex
Products, Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 161 (2d
Cir. 2004)(citation omitted).  Confusion giving rise to a claim
of trademark infringement includes confusion as to "source,
sponsorship, affiliation, connection, or identification."  Star
Industries, Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d
Cir. 2005)(citation omitted).  "The public's belief that the
mark's owner sponsored or otherwise approved the use of the
trademark satisfies the confusion requirement."  Id. at 384
(citation omitted).  Affiliation confusion exists where use of a
"unique and recognizable identifier" could lead consumers to

44

"infer a relationship" between the trademark owner and the new

product.  Id. (citation omitted).

To determine whether confusion is likely to arise, courts in

the Second Circuit apply the eight-factor test set forth in

Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d

Cir.1961).  These factors are: (1) the strength of the

plaintiffs' mark; (2) the similarity between the marks; (3) the

proximity of the products or services; (4) the likelihood that

the plaintiffs will "bridge the gap" between their offerings and

those of the defendants; (5) evidence of actual confusion; (6)

evidence of bad faith on the part of the defendants; (7) the

quality of the defendants' product; and (8) the sophistication of

the relevant customers.  Id.

> In balancing the Polaroid factors, courts generally
> should not treat any single factor as dispositive; nor
> should a court treat the inquiry as a mechanical
> process by which the party with the greatest number of
> factors wins.  Instead, the court should focus on the
> ultimate question of whether consumers are likely to be
> confused.

Natural Organics, 426 F.3d at 578 (citation omitted).[24]

---

[24] Defendants argue that, in performing this analysis, the
Court must take into consideration the PTO's determination that
"no similar registered or pending marks" existed at the time of
defendants' application.  While it is appropriate to "accord
weight" to an initial determination of a PTO examiner, see
Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 148 n.11
(2d Cir. 1997), Arrow Fastener Co v. Stanley Works, 59 F.3d 384,
392 (2d Cir. 1995), a district court must resolve the issue of
likelihood of confusion "not by reference to a registration
determination by the PTO but by application of the multi-factor
balancing test set forth in Polaroid."  Sterling Drug, Inc. v.
Bayer AG, 14 F.3d 733, 744 (2d Cir. 1994)(citation omitted).

1. Strength of the Mark

> [T]he distinctiveness or 'strength' of a mark measures
> its capacity to indicate the source of the goods or
> services with which it is used.  The greater the
> distinctiveness of the mark, the greater the likelihood
> that prospective purchasers will associate the same or
> a similar designation found on other goods, services,
> or businesses with the prior user.

Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir.

1997)(citation omitted).   "Strength" in this context encompasses

two concepts:

> The first and most important is inherent strength, also
> called 'inherent distinctiveness.' ...  The second
> sense of the concept of strength of a mark is "acquired
> distinctiveness," i.e., fame, or the extent to which
> prominent use of the mark in commerce has resulted in a
> high degree of consumer recognition.

Virgin Enters., 335 F.3d at 147.  "If a mark has been long,

prominently and notoriously used in commerce, there is a high

likelihood that consumers will recognize it from its prior use."

Id. at 148.

The DE BEERS mark possesses both inherent and acquired

distinctiveness.  As a mark registered without proof of secondary

meaning, it is entitled to the "rebuttable presumption that the

mark is more than merely descriptive."  Arrow, 59 F.3d at 393

n.6.  Defendants have presented no evidence to rebut this

presumption.  In addition, the mark has acquired further

distinctiveness through plaintiffs' advertising and publicity

efforts.  Plaintiffs have sponsored high-profile launch parties

for each of its stores and have received widespread newspaper,

magazine, and television coverage of their retail retail

46

enterprise.  Their stores have already achieved significant

sales.  Although much of consumers' familiarity with the mark can

be attributed to the decades-long advertising campaign of DBG,

plaintiffs' efforts have built on the pre-existing fame.[25]

Therefore, plaintiffs have shown that the DE BEERS mark is strong

and is accordingly entitled to robust protection.  This factor

favors plaintiffs.

---

[25] Defendants' additional suggestion that DBG allowed the
mark to become generic by failing to police it is spurious.  As a
matter of logic, in order to demonstrate that a mark was not
policed, a defendant must show that the mark was used by parties
that did not possess any rights to do so.  Here, defendants point
to DBG's sponsorship of a "generic" advertising campaign, as well
as promotional materials featuring the DE BEERS name that were
sent to jewelers.  Defendants have not, however, shown that these
were unauthorized.  Indeed, the only evidence seems to indicate
that the materials were not just authorized by DBG, but created
at their request.

To the extent that defendants also argue that the mark
became "generic" because it was used in the promotion of diamonds
generally, this contention must fail too.  While defendants are
correct that an entity can forfeit its rights in a mark if the
mark becomes associated with a category of products generally and
ceases representing an individual producer, that is not what has
happened here.  Courts have found "thermos," "aspirin," and
"walking fingers" to be generic because the "common usage" of
these terms had lost any connection to individual brands.
Bellsouth Corp. v. DataNational Corp., 60 F.3d 1565, 1570 (Fed.
Cir. 1995)(walking fingers); King-Seeley Thermos Co. v. Aladdin
Indus., Inc., 321 F.2d 577, 579 (2d Cir. 1963)(thermos); Bayer
Co. v. United Drug Co., 272 F. 505, 510-515 (S.D.N.Y.
1921)(aspirin).  But DE BEERS does not fall into this category.
While a consumer might request "aspirin" from a pharmacist
without any expectation of receiving a certain brand, no
purchaser of diamond jewelry would use "DE BEERS" in the same
way.  The primary objective of the DBG advertising campaigns may
have been to boost the sale of diamonds generally, but the
advertisements did not genericize the name DE BEERS.

## 2. Similarity Between the Marks

When the secondary user's mark "is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them." Virgin Enters., 335 F.3d at 149. In making that assessment "courts look to the overall impression created by the logos and the context in which they are found and consider the totality of the factors that could cause confusion among prospective purchasers." Star Indus., 412 F.3d at 386 (citation omitted).

Because defendants' mark has been used in commerce on, at most, one occasion, there are few contextual clues on which to rely in assessing the marks' similarity as they are used in the marketplace. In the single invoice produced by defendants, Syndicate's name appears at the top, in a relatively standard font, as "DeBeers Diamond Syndicate." Plaintiffs' mark is simply DE BEERS. A variation as slight as an omitted space does not serve to create a legally recognizable distinction between De Beers and DeBeers. See Virgin Enters., 335 F.3d at 149. The proposal for defendants' website prepared by Rosenblatt's son even adds the space so that the plaintiffs' and defendants' marks are identical. Moreover, DeBeers is clearly the dominant element in the Syndicate name. Rosenblatt admitted as much in a business plan he provided to a potential investor: "[Syndicate] believes that the most significant problems [in selling diamonds on line] have been 1) the lack of brand recognition, and 2) consumer lethargy ... The DeBeers name will solve the first problem."

48

For this reason, the website mock-up prominently displays the name "De Beers" alone and does not even include the full corporate name.  The same is true for many of the domain names registered by Rosenblatt.

Defendants have not argued, and could not do so successfully, that the addition of either or both of the words "diamond" and "syndicate" ameliorates the likelihood of confusion.  Of course, the PTO required defendants to disclaim both words when applying for registration, since neither is protectable.  Plaintiffs have also shown that DBG companies were often referred to, both in the media and within the diamond industry, as the "syndicate."  Further, American consumers strongly associate the De Beers name with diamonds.  Given the near identity of De Beers and DeBeers, and given that the remainder of the Syndicate name serves to increase, rather than reduce, the implied connection between the corporate defendant and the plaintiffs' mark as it is used in commerce, the two marks are not just similar but virtually identical.  This factor favors plaintiffs.

3. The Proximity of the Product and Service Offerings

The inquiry into the proximity of the offerings "concerns whether and to what extent the two products compete with each other."  <u>Morningside Group Ltd. v. Morningside Capital Group, L.L.C.</u>, 182 F.3d 133, 140 (2d Cir. 1999)(citation omitted).

When the two users of a mark are operating in

49

> completely different areas of commerce, consumers are
> less likely to assume that their similarly branded
> products come from the same source.  In contrast, the
> closer the secondary user's goods are to those the
> consumer has seen marketed under the prior user's
> brand, the more likely that the consumer will
> mistakenly assume a common source.

Virgin Enters., 335 F.3d at 150.  We look to the nature of the

products themselves and the structure of the relevant market.

Because the ultimate goal of the inquiry is to "determine whether

the two products have an overlapping client base that creates a

potential for confusion," Brennan's, Inc. v. Brennan's

Restaurant, L.L.C., 360 F.3d 125, 134 (2d Cir. 2004), a plaintiff

need not show that defendants' products compete directly with its

offerings in order to prevail.  Virgin Enters., 335 F.3d at 150.

Plaintiffs' primary product offering is diamond jewelry.

Defendants' sole offering will be polished diamonds, which are

almost always used in jewelry.  The connection between the two is

both close and likely to be intuitive to consumers.  This

conclusion is not changed by the fact that plaintiffs operate

retail stores that sell directly to consumers, whereas

defendants' only sale to date was to a wholesaler.  Defendants'

business plan describes Syndicate's business as "sell[ing]

unmounted certified diamonds to the public" and compares

Syndicate to an "on-line Walmart or K-Mart."  Defendants clearly

intend Syndicate to become a consumer-oriented enterprise if the

business is allowed to proceed under the current name.  This

increases the likelihood that their customer base will

substantially overlap with those of plaintiffs.

The defendants argue that any overlap will be negilgible because they will offer diamonds at "discount" prices, while plaintiffs sell jewelry to consumers who are not price-conscious. The defendants have not shown such a separation in the markets. The defendants plan to offer only certificated, gem-quality stones; the plaintiffs already offer items for sale that range well below $1,000.  Even the very affluent may be reluctant to pay more than what appears to be a reasonable market price for the quality of the stone in their item of jewelry.  This factor favors plaintiffs.

_____

4. Likelihood that Plaintiffs Will "Bridge the Gap"

Bridging the gap refers to the likelihood that the senior user (here, plaintiffs) will enter the market of the junior user (here, defendants) in the future, or that consumers will perceive that this is likely to occur.  Star Indus., 412 F.3d at 387. "This factor is designed to protect the senior user's interest in being able to enter a related field at some future time."  Savin Corp. v. Savin Group, 391 F.3d 439, 459-60 (2d Cir. 2004) (citation omitted).

As described above, the relationship between plaintiffs' and defendants' businesses is exceedingly close already.  To the extent the defendants' market is described as the sale of individual certificated diamonds, the plaintiffs have already entered that market.  The GBL identifies loose diamond gemstones -- precisely the product that defendants intend to sell -- as one

of the items that "shall represent a substantial proportion of
the products offered" by plaintiffs' stores.  The plaintiffs
allow customers to select separately the diamond and the setting
in which they want the diamond to be mounted.  To the extent that
the defendants' market is identified by its channel of trade, the
Internet, the plaintiffs may enter that market, as well.  The
plaintiffs already advertise their stones over the Internet and
are exploring selling their branded jewelry through other high-
end stores and on line, although those plans are far from
settled.  Therefore, this factor favors plaintiffs.

5. Evidence of Actual Confusion

        Actual confusion need not be shown to prevail under the
Lanham Act "since actual confusion is very difficult to prove and
the [Lanham] Act requires only a likelihood of confusion as to
source."  Savin, 391 F.3d at 459 (citation omitted).  Although it
is not a requirement, "[i]t is self-evident that the existence of
actual consumer confusion indicates a likelihood of consumer
confusion."  Virgin Enters. 335 F.3d at 151.  Since defendants
have not yet used their mark in commerce, data regarding actual
confusion among consumers, which would ordinarily be difficult to
develop in any context, is impossible to obtain here.[26]

_____

        [26] Defendants' suggestion that plaintiffs' failure to
present survey evidence on the likelihood of confusion should be
counted against them is unavailing.  "While survey evidence is
sometimes said to be evidence of 'actual' confusion, it is so
only to the extent that the survey mirrors the real world setting
which can create an instance of actual confusion."  3 McCarthy on

Nonetheless, as discussed above, one jeweler and multiple plaintiffs filing lawsuits have already misapprehended the relationship between defendants and DBG.  Particularly in light of defendants' lack of use of the mark to date, this is unusually probative of the threat of confusion among consumers posed by Syndicate's operation.  This factor favors plaintiffs.

6. Defendants' Bad Faith

The inquiry into willfulness or bad faith "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product."  Savin Corp., 391 F.3d at 460 (citation omitted).  The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith, even in the total absence of a trademark search," although bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark."  Star Indus., 412 F.3d at 389.  Where there is evidence of a junior user's knowledge of an earlier mark, courts have, on occasion, found good faith "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation."  Id. at 388.

In placing his corporate name on his office door in 1981,

Trademarks § 23:2.1 (2005).  Here, because Syndicate has not begun selling diamonds under its corporate name, a recreation of the "real world" is not possible, and no negative inference will be drawn from the lack of survey evidence.

Rosenblatt sought to signal to other New Yorkers in the diamond trade who were familiar with the Rosenblatt family business that he was reorienting it from the consignment of diamond jewelry and gemstones generally to the consignment of better quality diamonds. He intended each of the words in the corporate name to resonate with diamond merchants because of the connection each of the words -- De Beers, diamonds, and syndicate -- had in their minds with DBG. It is doubtful, however, that he expected his customers to be confused as to the source of any merchandise they might take from him on consignment. In that closed market, his customers would have understood the name as the latest iteration of the Rosenblatt family business and would not have believed that DBG or an entity associated with it had chosen to set up shop in New York by moving into the Rosenblatt offices.

The resurrection of the corporate name in 2002, however, is a horse of a different color. Again, the defendants intended to capitalize on the name recognition and goodwill created by DBG. This time, however, they also intended to deceive the public and sow confusion. This is true in the choice of Internet domain names, the attempt to obtain trademark registration, and the business plan for operating over the Internet.

Far from helping the defendants, their decision to proceed after a Thomson & Thomson search is damning. To the extent Rosenblatt was operating under any delusion that a DBG-related entity would not enter the United States to do business and thus would leave him room to mislead consumers about the sponsorship

and source of his products, once he saw the search results, he knew otherwise.  It showed a policing effort by the Jewelers' Vigilance Committee and eleven applications to register DE BEERS by a DBG affiliate.  At that point, Rosenblatt's decisions to apply for his own registrations, to obtain a website design proposal, and to seek investment dollars, were done entirely in bad faith.

7. Quality of the Products

The difference in the quality of the products is one of the less probative factors in a determination of the likelihood of confusion.  <u>Virgin Enters.</u>, 335 F.3d at 151.  Indeed, differing quality goes more to the harm that confusion can cause than it does to the likelihood of confusion.  <u>Id.</u> at 152.  While a marked difference in quality might harm a mark-holder more, it would also "militate against finding a likelihood of confusion" as customers are less likely to assume a high quality senior user would produce low-quality products.  <u>Star Indus.</u>, 412 F.3d at 389.

Defendants having sold at most one diamond, it is difficult to judge what quality differential, if any, will actually exist between plaintiffs' and defendants' offerings.  This factor has no effect on the Court's determination of the likelihood of confusion.

8. Sophistication of the Consumers

The inquiry into consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  Star Indus., 412 F.3d at 390 (citation omitted).  As a general matter, "the greater the value of an article the more careful the typical consumer can be expected to be."  McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137 (2d Cir. 1979).

Diamonds are perhaps the iconic luxury good and are, of course, extremely expensive.  It is reasonable to assume that the typical consumer will spend more time considering the purchase of a diamond than almost any other good he or she buys.  Plaintiffs are correct that consumer sophistication is not an absolute bar against confusion.  On balance, however, this factor weighs in defendants' favor.


9. Balancing the Factors

Of the eight factors courts in this circuit use to judge the likelihood of confusion, six favor plaintiffs, and only one -- the sophistication of the relevant consumers -- favors defendants.  While this outcome points undeniably toward a finding that confusion is exceedingly likely, such a detailed analysis seems almost superfluous in this case.  After all, the "ultimate question" that the Polaroid factors aim to answer is

whether consumers are likely to be confused -- and here, Rosenblatt has all but admitted that his primary reason for choosing the name DeBeers was to benefit from consumers' false impression that he was affiliated with DBG and, therefore, with plaintiffs, as well. DBLV TM has established that defendants have infringed on their registered trademark for retail store services featuring luxury goods in violation of Section 32 of the Lanham Act.

II. New York State Unfair Competition Claim

Under New York common law, "the essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 408 (2d Cir. 1997) (citation omitted). To prevail on a claim of unfair competition, a plaintiff must show "(1) likelihood of confusion and (2) bad faith." Empresa Cubana del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 284 (S.D.N.Y. 2002). As discussed above in the context of the Lanham Act claims, plaintiffs have made both necessary showings: defendants' use of DeBeers is all but guaranteed to cause confusion among consumers; and it was the desire to benefit from this very confusion that motivated Rosenblatt to renew his efforts to use the mark in the first place. DBLV TM therefore prevails on its claim of unfair competition under New York common

law.[27]


III. New York State Dilution Claim

Section 360 of the New York General Business law provides:

Likelihood of injury to business reputation or of
dilution of the distinctive quality of a mark or trade
name shall be a ground for injunctive relief in cases
of infringement of a mark registered or not registered
or in cases of unfair competition, notwithstanding the
absence of competition between the parties or the
absence of confusion as to the source of goods or
services.

N.Y. Gen. Bus. Law § 360-l.  "New York law accords protection

against dilution to marks that are distinctive as a result of

acquired secondary meaning as well as to those that are

inherently distinctive."  N.Y. Stock Exch., Inc. v. New York, New

York Hotel, LLC, 293 F.3d 550, 557 (2d Cir.2002).  Secondary

meaning exists where "the public is moved in any degree to buy an

article because of its source."  Genesee, 124 F.3d at 143 n.4

(citation omitted).  Factors that are considered in determining

whether a mark has developed secondary meaning include "(1)

advertising expenditures, (2) consumer studies linking the mark

to a source, (3) unsolicited media coverage of the product, (4)

sales success, (5) attempts to plagiarize the mark, and, (6)

length and exclusivity of the mark's use."  Id. (citation

_____

[27] This claim was brought on behalf of both plaintiffs.
Because DBLV TM has clearly established that defendants are
liable for engaging in unfair competition, however, it is
unnecessary to address whether DBLV has standing to bring the
same claim.  In any event, the parties have not briefed this
issue.

omitted).

Here, a detailed consideration of each of the factors is not required. Plaintiffs have shown that DBG engaged in a long-term and extremely successful and expensive advertising campaign, and received substantial press coverage. Plaintiffs have also demonstrated that many American consumers know the name DE BEERS and associate it with diamonds. The plaintiffs' two stores have made substantial sales in the short period they have been opened. Given this evidence, plaintiffs have comfortably cleared the burden of establishing that consumers are "moved in any degree to buy an article because of its source." Id. (citation omitted). Therefore, the mark is protected by New York's dilution law.

Dilution can involve either blurring or tarnishment. Id. Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiffs' product." Deere & Co. v. MTD Prod., Inc., 41 F.3d 39, 43 (2d Cir. 1994) (emphasis omitted). "To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." N.Y. Stock Exch., 293 F.3d at 558. Tarnishment, on the other hand, occurs where a trademark is "linked to products of shoddy quality, or is

59

portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiffs' unrelated goods." Id. (citation omitted).

Here, plaintiffs press a blurring theory of dilution. As with their unfair competition claim, the relevant analysis has been covered in the previous discussion of the Polariod factors. For the reasons discussed in that section of the Opinion, DBLV TM prevails on its New York dilution claim.[28]

Conclusion

DBLV TM has shown it is entitled to a judgment in its favor against both defendants on its claims for trademark infringement under Section 32 of the Lanaham Act; unfair competition under New York common law; and dilution under New York Gen. Bus. L. § 360-1.

SO ORDERED:

Dated:     New York, New York
           June 9, 2005

_____
DENISE COTE
United States District Judge

---

[28] Like the unfair competition claim, this claim was brought on behalf of both plaintiffs. Again, because DBLV TM has established defendants' liability, it is unnecessary to address whether DBLV has standing to bring the same claim.

60